FREDERIC W. STEVENS, EUGENE STEVENSON, EDMUND B. LEAM-
ING, VIVIAN M. LEWIS, JOHN H. BACKES, JOHN GRIFFIN,
JOHN E. FOSTER, MERRITT LANE, MALCOLM G.
BUCHANAN AND JAMES F. FIELDER,
VICE-CHANCELLORS.

---

DENNIS B. HARRIS

*v.*

ESPERANZA MINING COMPANY, a corporation of New Jersey,
et al.

[Decided October 11th, 1919.]

In a suit in chancery to recover commissions alleged to be due to an
agent for accomplishing a sale, on the "trust fund theory," evidence is
fully examined and *held* not sufficient to sustain the claim of the com-
plainant for such commissions.

On final hearing. On bill, answers and proofs taken in open court and on commission.

*Mr. J. W. Rufus Besson* and *Mr. Maximilian T. Rosenberg,* for the complainants.

*Messrs. Collins & Corbin* and *Mr. Louis Marshall* (of the New York bar), for the defendants.

STEVENSON, V. C.

This suit is brought to recover commissions amounting to over $200,000, alleged to have been earned by one Brad Barnar, the complainant's assignor, by procuring the sale of a Mexican mining property. The owner of this property was a Mexican corporation which has since been dissolved. The theory of the bill is, that having established the fact of the indebtedness of this Mexican corporation to Mr. Barnar, this suit may be maintained in the court of chancery of New Jersey for the recovery of the amount of the debt from the defendants the Esperanza Mining Company and the Guggenheim Exploration Company, two New Jersey corporations, on the ground that these defendants took over by assignment from the Mexican corporation all its assets and thereby became liable to pay its debts to the extent of the value of the assigned assets. It is conceded that the Mexican corporation in fact conveyed its mines and practically all its other assets to the defendant the Esperanza Mining Company of New Jersey, a corporation organized under the direction of the Guggenheim Exploration Company, to receive and manage such assets. After this conveyance of assets the Mexican corporation was dissolved. No objection was made to the non-joinder of the Mexican corporation or its liquidator as a party defendant. The bill alleges that there was no consideration for this transfer of assets "except the issuing of stock by the said Esperanza Mining Company of New Jersey." For all that appears in the bill the stock of this New Jersey corporation may have amounted to over $2,000,000 par value, and may have been actually worth that sum.

A number of interesting questions which were the subject of extensive oral argument and elaborate briefs may, I think, be left unconsidered, in view of the narrow ground upon which I shall rest the decision of this cause.

To sustain the jurisdiction of the court for the enforcement of what originally was a purely legal liability against the Mexican corporation, the famous "trust fund theory" has been invoked. This theoretical basis for the suit, although not set forth in the bill, may properly be deemed to be presented to the court by the allegations of fact therein contained, although those allegations appear to have been made in order to sustain a charge of actual fraud which was abandoned at the hearing. The applicability of the "trust fund theory" has been urged on behalf of the complainant without objection in an elaborate oral argument and a voluminous brief. The specific complaint which the bill makes against the transfer of these assets from the Mexican company to the defendants is, that the complainant and his assignor, Mr. Barnar, by such transfer "were prevented from collecting from" the Mexican corporation the said "sum of $202,500, the commission" earned on the sale.

No question in regard to the jurisdiction of the court is raised in either answer, and the parties went to final hearing upon the issues raised in those pleadings. The bill asserts, and the answers deny, that Mr. Barnar and the Mexican corporation entered into an agreement by which Mr. Barnar was to have a commission of ten per cent. in case he effected a sale. The answers deny that the complainant or his assignor was "the procuring cause of any sale" of the property in question. The answers also deny that, by reason of the transfer of the assets of the Mexican corporation to the defendant Esperanza Mining Company of New Jersey, Barnar, or the complainant, his assignee, was prevented from collecting any sum due them from the Mexican corporation. The answer of the defendant Guggenheim Exploration Company alleges that it never purchased the mines, &c., of the Mexican company, but that a syndicate composed of the said defendant, an English corporation known as the Venture Company, Limited, and a firm of brokers of London, England, known as L. Hirsch & Company, as the transferees of an option held by one E. A.

Wiltsee, purchased from various individuals a majority of the capital stock of the Mexican corporation; that said purchase was made in good faith and for a valuable consideration, viz., $3,000 in Mexican currency for each share of stock, and that the price of the shares was duly paid in good faith and without the knowledge that the complainant or his alleged assignor, Brad Barnar, had any claim for commissions.

When the case came to final hearing the bill distinctly presented a legal liability on the part of the Mexican company originally to Barnar, the complainant's assignor, and alleged that the two defendants, the Esperanza Mining Company of New Jersey and Guggenheim Exploration Company, were liable to pay this debt of the Mexican corporation because of their fraud in preventing its collection from that company, and also, because, apart from actual fraud, the defendants received practically all the assets of the Mexican corporation constructively in trust for the payment of the debts of that corporation.

Before any proofs were taken at the final hearing counsel for the defendants made a motion that the bill be dismissed, first, on the ground that it did not state sufficient facts to constitute a cause of action against either defendant, and second, on the ground that the complainant had not exhausted his remedy against his alleged debtor, the Mexican company, which motion was denied.

The parties went to final hearing upon the bill alleging a strictly legal indebtedness from this former Mexican company to the complainant's assignor, Mr. Barnar, and further alleging a strictly equitable liability on the part of the defendants, or one of them, to discharge this legal liability. The equitable liability was based upon a charge of actual fraud and of the equitable obligation cast by law upon the assignee of all the assets of a corporation to apply those assets to the payment of the debts of the corporation. Thus, these alleged equities were presented distinctly to the court for determination and they could not be determined in any other court.

In addition to the basis of jurisdiction above stated, it should be borne in mind that this was a suit brought by an assignee of a chose in action, this legal debt from a Mexican company to Mr.

Barnar. Anciently, the assignee of such a chose in action had no standing in a court of law so as to be able to bring an action in his own name; he was obliged to sue in equity and the assignor was a necessary party to the suit. *1 Dan. Ch. Pl. & Pr. 197, 198.* Thus we have, even as against the Mexican corporation if it were in existence to-day and had been brought into this suit, a case which comes within an old-established head of equity. It is true that the extension of the jurisdiction of courts of law over suits brought by assignees of choses in action in their own name, has largely diminished the number of instances or classes of cases in which a court of equity will exercise its ancient jurisdiction, but the jurisdiction still remains and in a proper case where the remedy at law is not adequate will be exercised. *Hayes* v. *Hayes, 45 N. J. Eq. 461; affirmed, 47 N. J. Eq. 567.*

The same practical limitation of the exercise of jurisdiction by a court of equity by the expansion of the jurisdiction of law courts by their own action or by the effect of legislation, is seen in the case of bills to recover damages for fraud, bills for an accounting and bills for new trials. See *Streeter* v. *Braman, 76 N. J. Eq. 371,* and cases cited on *p. 375.*

None of the above-mentioned instances, in my judgment, affects the general equitable principle that "jurisdiction once existing is not lost because the courts of law have subsequently acquired a like authority." *1 Pom. Eq.* § *276.*

It is also, I think, well settled in New Jersey that where the parties have joined issue without raising the jurisdictional question, or rather the question whether the case presented by the pleadings is one in which a court of equity will now exercise its jurisdiction and the case has gone to final hearing and the proofs have been taken, it is too late to raise the question. The court will consider that the parties have in effect stipulated that facts exist which make the exercise of jurisdiction appropriate. This rule does not interfere with the power of the court of its own motion to prevent the imposition upon it of causes which ought to be brought in another tribunal. *Varrick* v. *Hitt (Court of Errors and Appeals, 1903), 66 N. J. Eq. 442; Van Horn* v. *Demarest, 76 N. J. Eq. 386, 391; S. C., affirmed on appeal, 77 N. J. Eq. 264.*

It certainly cannot be plausibly argued that when this cause came on for final hearing the case presented by the pleadings did not present a scintilla of equity. *Palys* v. *Jewett, 32 N. J. Eq. 302.* It will be observed that even this late objection made for the first time when the final hearing was on was not directed towards the jurisdiction of the court, either of the subject-matter or of the parties. Apart from the general demurrer which counsel for the defendants attempted to interpose, the sole objection to the exercise of jurisdiction was on the ground that the complainant had not exhausted his remedy at law. The vice-chancellor, before whom the final hearing was commenced, in denying the motion to dismiss the bill, evidently held that this sole objection to the exercise of jurisdiction, either was without merit under the peculiar circumstances of the case or was presented too late for consideration. I perceive no reason why this court for its own protection should refuse to finally determine this litigation which these parties in good faith submitted to the determination of this court. I say this without intimating that any timely objection made *in limine,* either to the jurisdiction of the court over this case or to the exercise within its discretion of a jurisdiction which it undoubtedly possesses, on the ground that the remedy at law was adequate or otherwise would have been sustained.

The allegations of the bill charging that the defendants acquired the assets of the Mexican corporation with actual intent to defraud Brad Barnar and to prevent him from obtaining his commissions from the Mexican corporation were abandoned. Counsel for complainant, however, insist that the case is one of "constructive fraud." Disregarding this mischievous and misleading phrase, which unfortunately is a part of our legal terminology, the actual claim is, that under the circumstances proved the defendants are liable in equity for this unpaid debt of the Mexican corporation, and the "trust fund theory" is invoked to sustain this claim.

In January, 1903, there were two independent negotiations pending for the purchase of the mining property of the Mexican corporation. The representative of the company in these negotiations was Mr. Sahlberg, who was the general manager of the

corporation at its mines. The mine had been in the market for sale for a number of years and was quite widely known to brokers and promoters who handled property of this class. The Mexican company was equipped with a president, a board of directors and other officers, but, so far as appears, the effort to sell the property of the company seems to have been made by Mr. Sahlberg practically alone. Whether he had any authority from the board of directors to dispose of the mining property of the corporation so as to put it out of business does not appear. The inference would seem to be that he had not. There was certainly nothing in his functions as general manager of the business of the company at the mine which could give him by implication such an extraordinary power. Moreover, the uncontradicted evidence on behalf of the defendants showed that the law of Mexico provided that such a sale as Mr. Barnar undertook to negotiate and effect could have been made only by a resolution at a general stockholders' meeting supported by a certain prescribed majority.

We are, however, not dealing with a contract for the sale of this mining property, but a contract or alleged contract made by Mr. Sahlberg, the general manager, purporting to bind the corporation to pay Mr. Barnar a commission in case he should effect a sale. Barnar undertook the work of negotiating this sale— finding a purchaser—presumably knowing right well that no sale could be effected except in compliance with the law of Mexico above mentioned. Assuming, as seems to be the case, that Mr. Sahlberg had no authority to enter into a contract to sell this mining property, or to sell all the shares of stock in the Mexican corporation, the question still remains whether he was empowered to make on behalf of the corporation a contract with Mr. Barnar giving him a specified compensation in case by his efforts a purchaser was found for the mining property, and the sale of that property should be carried out by the Mexican corporation according to Mexican law. Whether a binding contract for commissions was made by the Mexican corporation through Sahlberg is one of the questions which I do not feel obliged to answer.

The condition of affairs seems to have been such that no doubt Mr. Sahlberg could safely negotiate a sale of the mining property of the company if the price should prove satisfactory to the parties interested. It would seem, also, that he could have given an option on sixty per cent. of the capital stock of the Mexican corporation if the price was satisfactory to himself and to Mr. Mendes, the president of the Mexican company. Mr. Sahlberg and Mr. Mendes each held thirty per cent. of the stock.

In September, 1902, Mr. Sahlberg assumed to authorize Mr. Barnar, who was a mere broker, to sell the company's mining property for $3,000,000, engaging that he would be paid a commission of ten per cent.

The testimony in this cause indicates quite positively that the policy of the Mexican corporation with respect to the employment or authorization of brokers to sell its property, was substantially the same as that which many owners of real estate have adopted with respect to employing brokers to sell the same. Brokers, as a rule, do not hesitate to expend time and even money in endeavoring to effect a sale before the owner has in any way legally bound himself to pay any commission. They know that they can proceed with safety, in view of the character of the party for whom they are acting. The president of this Mexican corporation, Don Louis Mendes, is shown to have been a man of integrity, wealth and high standing as a citizen and as a lawyer at the Mexican bar. The indications also are that Mr. Sahlberg was also a man scrupulously honest and fair in his dealings and there is no testimony indicating otherwise. If Mr. Barnar had effected a sale of this mining property, no doubt his commission would have been paid to him; these Mexican mineholders, presumably, would not have undertaken to appropriate the result of his labor and then resort to technical rules of law in order to defeat his honest claim for his commission, if, indeed, such a thing would be possible under Mexican law.

This contract, or alleged contract, on the part of the Mexican corporation is proved, or attempted to be proved, mainly by the production of two letters. The first letter bears date September 20th, 1902, and was mailed by Mr. Sahlberg from Mexico to Mr. Barnar in Chicago, Illinois. Mr. Barnar, for nearly a year,

at least, and, perhaps, for a greater period of time, had been endeavoring to effect a sale apparently without any contract or writing purporting to be a contract upon which he could base a claim for commissions in case of his success. In November, 1901, he was negotiating for a sale of the property to a London party. In September, 1902, he was negotiating in Chicago for a sale of the property to one Lee and his associates, and, in connection with this effort, he obtained a letter dated September 20th, 1902, from Mr. Sahlberg, which states:

"If the Esperanza property is sold through your intervention for three million dollars gold before the end of this present year, this company is willing to pay you ten per cent. of said sum as your commission, but no more. If sold for less or after the specified time no commission will be paid."

This letter was signed as follows:

"For The Esperanza Co.,
Aug. Sahlberg, *Mgr.*"

The evidence indicates that when Mr. Barnar determined to abandon the negotiation with Lee and his associates he wrote to the complainant, Mr. Harris, in December, 1902, calling his attention to this Mexican mining property and asking for his assistance to effect a sale. Mr. Harris thinks that the date of this letter was December 15th, 1902. The result was that Mr. Barnar, at Mr. Harris' request, gave him the map and other papers pertaining to the property, and Mr. Harris, on the 23d day of December, 1902, opened the matter with the secretary of the Guggenheim Exploration Company, Mr. Porter, and a little later, on the same day, Mr. Harris introduced Mr. Barnar to Mr. Porter and Mr. Rogers, which last-named gentleman was the general manager of the company.

On the same day, December 23d, 1902, Barnar telegraphed to Sahlberg and also mailed him a letter from New York, in which letter he states that he had been "fooled along" by the Chicago parties for six weeks, and that he had come to New York and presented the proposition "to a concern here which has a capital of thirty millions and buys mines." In this letter he says, in

effect, that "parties connected in transaction" required him to send the telegram calling for an agreement to pay the commissions "on any price you may accept." It will be observed that Mr. Barnar does not give the name of the party with whom he had opened his negotiation.

On December 31st, 1902, Sahlberg telegraphed to Barnar:

"Letter received. Agree ten per cent. on any sum accepted. Strongly recommend immediate attention. Letter to-day."

The same day, December 31st, 1902, Sahlberg-mailed a letter to Barnar stating, among other things:

"Any price my company may choose to accept below the three million dollars gold will be subject to the commission of ten per cent.  *  *  *
There is one thing you must remember, and that is, that no option has been given by our Co. to yourself or your people, and it may be that some other purchaser will step in and buy the property under your very noses. If they do you have nobody to blame but yourself.  *  *  *  I shall probably go to the States in about two weeks to buy machinery," &c.

Inasmuch as this telegram and this letter were sent on the last day of the year they may be regarded as a waiver of the time limit contained in the letter of September 20th, 1902. It would have been idle to assure Barnar by telegraph that he would be entitled to a commission on any price the Mexican company "may choose to accept below three million dollars gold" if the negotiation had to be concluded and the price accepted by the Mexican company on that day, the last day of the year, 1902. The more detailed assurance to Mr. Barnar in regard to his commission contained in the letter of December 31st could not have reached Mr. Barnar in New York until a day or two after the time limit had expired. The parties, manifestly, were arranging for a commission to be paid in case of sale after December, 1902.

The negotiation in New York between Barnar and Harris and the exploration company appears to have continued during January and part of February, 1903.

In the early part of January, 1903, the exploration company communicated with their mining expert in Mexico, Mr. Doerr, with reference to his examination of the mining property, which

apparently would be a protracted and expensive work without the aid of Mr. Sahlberg and his superintendents at the mine, Mr. Doerr thereupon wrote a letter to Mr. Sahlberg calling for a great deal of information—a great deal of data in regard to the mine.

On January 8th, 1903, Barnar telegraphed to Sahlberg for the first time, disclosing the party with whom he was negotiating, and asking Sahlberg to "see their engineer, Doerr, Mexico City."

On January 15th, 1903, Sahlberg telegraphed to Barnar as follows:

"Doerr declines going to mine. He wants all kinds information. We refuse. I shall arrive in New York 25th on other business."

This telegram was followed by a letter from Sahlberg to Barnar dated January 16th, 1903, stating that life was too short and Sahlberg's time was too limited to enable him to supply Mr. Doerr with the desired information, and that if Mr. Doerr should "change his mind and want to visit the mine for a preliminary examination, instructions have been given to give him all facilities," &c.

Sahlberg came to New York, and on the day following his arrival, which Mr. Harris thinks was January 30th, 1903, he went to the office of the exploration company with Mr. Harris and was introduced by him to Messrs. Porter and Rogers. At this interview Mr. Sahlberg corrected a representation which Mr. Barnar had made, greatly reducing the value of the ore which was in sight. The mistake had arisen from giving the gross amount of the proceeds instead of the net. Another meeting of these parties was had the next day at which the proposition of the Mexican company, or of Mr. Sahlberg, to sell the mining property for $3,000,000 gold seems to have been thrashed out. The manager, Mr. Rogers, stated at this interview that the exploration company "did not wish to buy the property at the price that Mr. Sahlberg asked for it, which was 12½% on three million dollars," but stated that he was willing to buy "on an eighteen and a half per cent. basis." (See testimony of Harris, page 140.) The fact was developed that the map, statement of

earnings and other papers which were first exhibited by Mr. Barnar to Messrs. Porter and Rogers,

"showed certain earnings which would mean 18% on a purchase price of three million dollars, and that Mr. Sahlberg's earnings showed 18% on a very much less than three million dollars, on a sum nearer two million of dollars."

Mr. Rogers declared that

"they would deal on the basis of Mr. Sahlberg's figures, perhaps, but that they certainly would not deal on the basis of Mr. Barnar's figures; that they would not give three million dollars for the property because that would only mean something like 12% on their purchase price." (Page 141.) .

Mr. Sahlberg then stated that

"he was going to Chicago and on his return would like to take up the matter again with Mr. Rogers, and they agreed to that and he left with that understanding and went to Chicago."

There was no intimation from Mr. Rogers that he would entertain a proposition to accept the mining property at the price of $3,000,000 in gold. The only price which he spoke of as one which the exploration company would consider was a little more than $2,000,000.

On the other hand, Mr. Sahlberg did not drop a hint that his company would sell for any price less than $3,000,000 in gold. He, naturally, refrained from intimating that he would reduce his price because he was then, as we shall see, negotiating for a sale of the mine to other parties.

Sahlberg returned from Chicago some time in February, 1903, and had a third and last interview with Mr. Rogers, and the next day after that interview he (Sahlberg) left for Mexico. I think Mr. Harris is mistaken in stating that this interview was held in the latter part of February. I do not think that the exact date was shown. We find, however, on that February 3d, 1903 (testimony of Barnar, page 123. See, also, page 124), Mr. Rogers wrote a letter to Mr. Sahlberg, addressing it to the Everett House, New York, where Mr. Sahlberg had been stay-

ing while in New York. This letter is signed by Mr. Rogers and reads as follows:

"In accordance with understanding with you I have taken up the question of the Esperanza property with the members of our board, and find that they would not be willing to entertain the proposition at the figures presented. The discrepancy between the price that you have asked for the property and that at which they would be willing to make an examination of a mine is so great that I fear there is no chance of our coming together. I return herewith the maps and papers which you left at this office. Thanking you for your courtesy in the matter.

Very truly yours,

E. M. ROGERS,
*General Manager.*"

Inasmuch as Mr. Sahlberg went to Chicago to buy machinery for his mine after the interview of January 31st, 1903, it seems quite probable that this letter of February 3d, 1903, was written by Mr. Rogers to await Mr. Sahlberg's return to New York. It gave Mr. Sahlberg full notice of the action of the directors of the exploration company with reference to the price ($3,000,-000) which Mr. Sahlberg had asked. I do not think that it is of importance to ascertain whether Mr. Sahlberg received this letter before or after his last interview with these officers of the exploration company. In accordance, however, with the agreement at the second interview, a third interview between the parties was held which did not bring them any nearer to an agreement. Mr. Harris testified (pages 142, 143) that Mr. Rogers represented to Mr. Sahlberg that he was willing to buy the mine on an eighteen and a half per cent. basis, and that he further said:

"Whenever you are ready to accept that price, or sell it on that basis, let me know through Mr. Barnar or Mr. Harris, whichever one you are corresponding with, and we will have the property examined and buy it, if it comes up to your representations."

Mr. Harris continues:

"With that understanding Mr. Sahlberg left. I went with him up to his hotel, and he left the next day. He told me that he was going to Mexico and I never saw him afterwards."

He died on the 30th of April following. Mr. Harris testified that after the third and last meeting of Mr. Sahlberg with the agents of the exploration company that he (Harris) from time to time casually met Rogers, and on these occasions Mr. Rogers made inquiries about the Esperanza mine and indicated his interest in it. There was, however, no resumption of the negotiation whatever and Mr. Rogers ceased to be an agent of the exploration company on March 18th, 1903.

As we shall see, Mr. Sahlberg, following his plain notification to Mr. Barnar, was negotiating through another mining broker, Mr. Wiltsee, for the sale of this mining property to other parties. This negotiation seems to have been for the sale of the stock or a majority of the stock of the Mexican company. There are indications that if the Barnar negotiations had resulted in a sale the subject-matter of the sale would have been the stock of the company. If the purchaser desired to have all the assets turned over to a New Jersey corporation, it would be quite probable that the first acquisition which would practically affect the sale, so far as the broker's commissions are concerned, would have been the acquisition of the capital stock of this Mexican corporation.

This other party with whom Mr. Wiltsee was endeavoring to deal consisted of the eminent mining engineer, John Hayes Hammond, and a London corporation engaged in buying mines and promoting mining companies, called the Venture Company, whose agent was one Baker, who spent portions of his time in New York City, at what was in effect the American office of the Venture Company, in the office of Mr. Hammond. The Venture Company was acting in this affair on its own behalf, and also on behalf of the London firm of L. Hirsch & Company, although the name of this firm appears not to have been used in the early part of the negotiation. Sahlberg met Messrs. Wiltsee and Hammond in New York City on the occasion of his visit in January and February, 1903, while he was negotiating with the exploration company, but he concealed the fact of this contemporaneous negotiation from Barnar, Harris and the exploration company, as he had a perfect right to do. It may be that this negotiation through Mr. Wiltsee had such a hopeful look to Mr.

Sahlberg that he was encouraged to stand stiffly on his price ($3,000,000) with the exploration company until the Wiltsee proposition had been worked out to a finish. According to Mr. Harris, he had practically the assurance from Mr. Rogers that the exploration company would take up the negotiation again, provided he (Sahlberg) would agree to accept a price on an eighteen and a half per cent. basis.

There is no evidence to show, or even in any way indicate, that the Mexican corporation, or the stockholders of that corporation, or the holders of the majority of the stock of that corporation, even through Mr. Barnar or Mr. Harris, undertook any negotiation with the exploration company to sell the assets of the company or to sell its capital stock for a sum less than $3,000,000. Both Barnar and Harris were powerless to do anything in the premises until Mr. Sahlberg, or some other agent of the Mexican company, should indicate that the Mexican company would negotiate for the sale of the assets, or the stockholders of that company would negotiate for the sale of its stock for less than $3,000,000, and no such intimation was ever made. Mr. Sahlberg, whose position as general manager the evidence shows it would have been extremely difficult, if not impossible, to fill with another man, during all these negotiations was suffering from ill-health—from a disease of which he died less than two months after his departure from New York in February, 1903. Some weeks after Mr. Sahlberg returned to Mexico, Mr. Wiltsee followed him and had one interview with him. Before Mr. Wiltsee could negotiate further Mr. Sahlberg went to Tampico on account of his health and died while there. This brief interview with Mr. Wiltsee seems to have been the only point of contact between the parties on the two sides of the Wiltsee negotiation after the meeting in New York of January or February, 1903.

It will be observed that Mr. Sahlberg by his death left both these concurrent negotiations for the sale of the mine—the one initiated by Wiltsee and the other initiated by Barnar and Harris—all in the air. The difference between the negotiations was that Mr. Barnar's had come to an end, although it was possible that it might be revived at any time, while the Wiltsee negotia-

tion was actively progressing, and the expert of the Wiltsee party, as we shall see, had been sent to inspect the mine and report to Mr. Hammond and his associates.

I think the testimony shows beyond doubt that the negotiation by Barnar and Harris with the exploration company had ended in failure—that their efforts in no sense procured the sale which was afterwards effected through the Wiltsee negotiation, and that the last-mentioned sale would have been effected if Barnar and Harris had never brought their proposition to the attention of the exploration company.

The theory of the complainant is, that because Mr. John Hayes Hammond, on February 18th, took Mr. Rogers' position as general manager and mining expert of the exploration company, and that company acquired his interest in the option which Wiltsee obtained, and which resulted in a sale to the syndicate whom Wiltsee had got together, therefore, the sale must be attributed to the efforts of Barnar or to the fact that he and Harris brought Sahlberg and the exploration company together and thus initiated a negotiation for the sale. I think that this theory is erroneous. It may be conceded that, so far as the aspect of the case now under consideration is concerned, the claim of the complainant might be supported if the exploration company after substituting Mr. Hammond for Mr. Rogers had taken up the negotiation initiated by Barnar and Harris and made a deal for the entire capital stock or the assets of the Mexican company at a price less than $3,000,000 in gold. That such was not the case, I think, appears distinctly if the whole history of the Wiltsee-Hammond-Venture Company negotiation is examined and carefully considered. Such history I shall endeavor as briefly as possible to state.

Mr. Ernest A. Wiltsee, a mining engineer by profession, was engaged at the time of the transactions which we are investigating, in "securing valuable mining properties with the idea of turning them over to financial friends" with a view to their being exploited on the market. Mr. Wiltsee had been associated with Mr. John Hayes Hammond, in California and in Africa, in which last place he had been one of Mr. Hammond's assistants. At the time under investigation his relations with Mr. Ham-

mond were intimate and he was associated with him in mining enterprises in Mexico. Mr. Hammond for years had been acquainted with the Esperanza mine; had visited and to some extent examined that mine, and about the year 1898 was interested financially in an option on the mine.

Mr. Wiltsee prior to 1903 had brought the Esperanza mine to Mr. Hammond's attention, and there seems to have been an understanding between them that when he (Wiltsee) thought the mine had been developed sufficiently to make it the subject-matter of a deal on terms which the owners would accept, he would present it to Mr. Hammond. Mr. Hammond was then acting as consulting engineer for the above-named Venture Company of London. Mr. Hammond was not merely an officer or employe of the Venture Company, but was working "in joint account" with that company, the profits on all deals being divided equally between them.

At the end of 1902, and the beginning of 1903, the situation of these parties—Wiltsee, Hammond, the Venture Company, Hirsch & Company and Sahlberg—is distinctly disclosed by the testimony. None of these parties had any relation whatever with the Guggenheim Exploration Company or Harris or Barnar, except that Mr. Sahlberg was endeavoring through Mr. Barnar to sell the Esperanza mine to that company, reserving to himself most distinctly full power to sell the mine to another party "under the very noses" of these agents, Barnar and Harris.

When Mr. Sahlberg came on to New York and Chicago to buy machinery for his mine, and, incidentally, endeavored to negotiate through Messrs. Barnar and Harris with the Guggenheim Exploration Company for the sale of his mine or the stock of his company, he had an interview with Mr. Wiltsee, who had no connection with Barnar or Harris, but for months, or years, had been watching the Esperanza mine and waiting for an opportunity to sell it and earn a commission. Mr. Sahlberg very naturally availed himself of his visit to New York to prosecute both of the negotiations for the sale of his mine with these two different parties, and abstained from telling either that he was negotiating with the other. The result of the negotiation with

the Guggenheim Exploration Company, as we have seen, ended in failure. The exploration company refused to consider the property at the price ($3,000,000) which Mr. Sahlberg asked, and Mr. Sahlberg made no intimation that he would take a smaller price. The negotiation ended with a mere understanding that if Mr. Sahlberg concluded to accept a price, about one-third less than the price which he insisted upon, the exploration company would take up the matter again.

During the few days of Mr. Sahlberg's stay in New York City he got in contact with Mr. Wiltsee, and the result was a conference with Mr. John Hayes Hammond at his office. Mr. Wiltsee informed, or had informed, Mr. Hammond that if Mr. Sahlberg's statements were correct the mine had been developed sufficiently to indicate that it was worth the price at which it could be obtained. The result of this interview was that Mr. Hammond, acting for himself and the Venture Company and its client, Hirsch & Company, and Mr. Sahlberg, came to an understanding, to the effect that Mr. Sahlberg should go back to Mexico and get an option on the stock of the company, and that Mr. Hammond should send an expert to examine the mine so as to verify Mr. Sahlberg's statements. The maps of which Mr. Sahlberg produced, according to the testimony of Mr. Wiltsee, did not show the assays of the different blocks of ore. While Mr. Sahlberg appears in this case to have been a man of integrity, it was plainly necessary that there should be an expert examination in behalf of these intending purchasers before any contract safely could be made.

The inference is unavoidable that Mr. Sahlberg considered that the negotiation through Mr. Wiltsee with Mr. Hammond and the Venture Company of London was more hopeful of good results than the abandoned or suspended negotiations with the Guggenheim Exploration Company. The position which the exploration company took through its general manager, Mr. Rogers, was that the Mexican company would have to agree to sell the mine on an eighteen and a half per cent. basis before it would incur the expense of an examination. On the other hand, it appears that Mr. Hammond sent an expert to examine the mine before Mr. Sahlberg obtained, or could obtain, any option.

As we have seen, Mr. Sahlberg went back to Mexico where a little later Mr. Wiltsee had an unimportant interview with him, after which Mr. Sahlberg went to Tampico for his health, where he died before any option on the stock of the Mexican company had been obtained.

Thus, it appears that through the sole efforts of Mr. Wiltsee, who did not know Mr. Barnar or Mr. Harris, and had no connection whatever with the Guggenheim Exploration Company, the sale of this mining property was practically agreed upon between the syndicate composed of the Venture Company of London, Hirsch & Company of the same place and Mr. John Hayes Hammond in the early part of February, 1903, before Mr. Hammond had any connection whatever with the Guggenheim Exploration Company. All that was left to be, done was to verify the representations of Mr. Sahlberg, and then to get an option on the stock, of which Sahlberg and Mendes owned sixty per cent., while the remainder was largely under their control.

We have now reached in the history of this Wiltsee deal the month of May or June, 1903. During the period that intervened between the conditional deal between Mr. Hammond, representing himself and his associates, and Mr. Sahlberg, in January or February, 1903, Mr. Hammond had taken Mr. Rogers' place as general manager and mining engineer of the Guggenheim Exploration Company. He was elected to this position on February 18th, 1903, and appears to have entered upon the discharge of his duties in the following March.

The whole Wiltsee negotiation originated, as we have seen, and was virtually brought to a conclusion (subject, however, to a favorably report from an expert), among men, a broker and intending purchasers, no one of whom had the slightest connection with the Guggenheim Exploration Company or Mr. Barnar or Mr. Harris. It turned out, however, that before the necessary report could be made by the expert employed by Mr. Hammond, and before any option could be obtained, Mr. Hammond became the general manager and expert of the Guggenheim Exploration Company, and it seems, although, perhaps, it is not legally shown, that his contract with the exploration company prohibited him from going into outside ventures. When the Wiltsee

option was absolutely obtained, Mr. Hammond testifies that "under the terms of his contract with the Guggenheim company he turned over his option on the property." Mr. Hammond further testifies that he thinks that his inchoate Esperanza negotiation was referred to in his contract with the Guggenheims.

The evidence strongly indicates that the death of Mr. Sahlberg was a very great embarrassment to the owners of the Esperanza mine, and made them more ready to listen to propositions for the purchase of the mine on terms less advantageous to themselves than those which had originally been stated by Mr. Sahlberg. Mr. Guggenheim testifies that the property was purchased upon the basis of $2,000,000, which is substantially the figures which Mr. Rogers calculated the property would bear when Messrs. Harris and Barnar brought the property to his attention. After Mr. Sahlberg's death, Mr. Wiltsee took up the matter of the option with Mr. Quirk, who was the administrator of the Sahlberg estate, and through him Mr. Mendes was brought in, or forced in, and the result was an option with these gentlemen for the purchase of sixty per cent. of their holdings of the stock with leave to all other stockholders to come in at the same price. In this way the option upon the entire stock was secured, and Mr. Hammond in duty bound offered his interest to the Guggenheim Exploration Company, and he testifies that the president of the company, Mr. Daniel Guggenheim, would hardly listen to him, and thereupon he betook himself to Mr. William C. Whitney, a large stockholder in the exploration company, and they agreed that if the Guggenheim Exploration Company would not take the property, they would take it themselves individually with the London partners, which course of procedure no doubt Mr. Hammond's contract with the exploration company did not prohibit.

All of the stock of the company was thus purchased, the Guggenheim Exploration Company receiving fifty-one per cent. and the Venture Company of London receiving for itself and Hirsch & Company forty-nine per cent. Later followed the incorporation of the New Jersey company to receive and exploit this mining property, the conveyance of the property by the Mexican company to the New Jersey company, and, later, I think, the

transfer of the stock of the Mexican company to the New Jersey company, and the dissolution of the Mexican company.

If Mr. Hammond had never become connected with the exploration company and its general manager, or otherwise, the claim of Messrs. Barnar and Harris advanced in this cause would have been too preposterous for consideration.

If Mr. Hammond's contract with the Guggenheim Exploration Company, made February 18th, 1903, had permitted him to carry out his inchoate negotiations for the purchase of mines, instead of turning them over to the exploration company or giving that company an option to take them, and he (Hammond) had proceeded, representing himself and the Venture Company, to acquire the Wiltsee option, and under it to purchase the stock of the Mexican company, any claim on the part of Mr. Barnar or Mr. Harris, it seems to me, would be equally preposterous.

The only circumstance which gives any color, in my judgment, to the complainant's claim, arises from the fact that after this independent deal, which was leading right up to the sale of the mine, had been almost brought to a finish, Mr. Hammond became liable to offer his interest to the Guggenheim Exploration Company. This circumstance, although it adds confusion to this complex case, and is liable to mislead any mind which does not accurately analyze the facts which constitute the history of these two independent negotiations, does not, in my opinion, form any basis for the Barnar claim that he earned a commission on the sale of this mine.

As I have heretofore intimated, the test of the complainant's claim is found in the proposition that the efforts of Messrs. Barnar and Harris did not "procure the sale" to the Guggenheim Exploration Company—that the sale through Mr. Wiltsee would have been effected if Messrs. Barnar and Harris had never offered the mine to the Guggenheim Exploration Company— had never heard of the Esperanza mine or made the slightest effort to effect its sale.

The legal situation in this case is analogous to a very simple one which is very liable to occur and which probably has not infrequently occurred. The owner of land authorizes a broker to

procure a purchaser, retaining, however, full power to sell his land at any time to any party other than those with whom the broker may undertake to negotiate. The broker offers the property to a party. The owner and this party are brought together after three conferences; the negotiation is broken off because the parties cannot agree as to the price. There is a possibility, however, that the owner may reduce his price and that a sale may be effected, in which case it may be conceded that the broker would have earned his commission. After the negotiation was abandoned, or suspended, the owner makes a sale through another broker to a stranger—a party having no connection of any kind with the first-named broker or the party who was negotiating through that broker for the purchase of the property. The party brought forward by the first broker subsequently buys the land in question from the purchaser whom the second broker has procured. Can it be plausibly argued that the first broker would thereupon be entitled to commissions? If the sale was made through the second broker, the unfortunate landowner would thus be paying double commissions. It will be observed that the last-mentioned sale was not a sale by the original owner but by his vendee. It is true that the efforts of the first broker may have procured a subsequent sale from a subsequent owner of the land, but that is not the sale on which he could earn a commission under his contract with the original owner.

In this present case it must be borne in mind that Hammond, the Venture Company and L. Hirsch & Company, the syndicate which actually bought this land, constituted an independent party. After they had bought the mine they were free to sell it to any party. Suppose they sold it, the whole mine, or the entire capital stock of the Mexican company, or both, to the Guggenheim Exploration Company, would Mr. Barnar have the slightest claim against the original owner, the Mexican company, for his commission, even if we suppose that Mr. Barnar's efforts in giving information in regard to the mine in the winter of 1902–03 in fact induced the Guggenheim Exploration Company to look up the purchaser of the mine and buy the mine from such purchaser? In one sense, Mr. Barnar would have

been the procuring cause of the sale of the mine—that is to say, the procuring cause of the sale of the mine by a subsequent purchaser to whom Mr. Barnar was at all times a stranger.

The Guggenheim Exploration Company merely acquired under its contract with Mr. Hammond the interest in the Wiltsee option which Mr. Hammond was negotiating for. If this company had declined to take Mr. Hammond's interest, then Mr. Hammond and Mr. Whitney stood ready to take it, and the sale would have been effected to the same syndicate for whom Mr. Wiltsee was operating, with the addition of Mr. Whitney to its membership.

Let us suppose that Mr. Barnar offered this entire mining property to five different parties who, were all favorably impressed but would not pay the price named. Subsequently, all of these five parties come into the Wiltsee syndicate and purchase shares. Would Mr. Barnar have a valid claim for a commission against the Mexican company? If so, would he be entitled to a commission on the whole price or only that proportion of the price which represents the purchases of the five parties?

Mr. Barnar was not authorized to sell portions of this property. He was to sell "the Esperanza property" in order to earn a commission. Mr. Barnar's claim is for full commissions ($202,000) on the price for which the mining property was sold through another broker, Mr. Wiltsee.

A number of questions have been raised and argued in this cause in regard to the enforceability at law of the alleged contract between the Mexican company and Mr. Barnar for his commissions, assuming that through Mr. Barnar the sale of the mine was effected. Both answers set up the New Jersey statute of frauds while there is neither allegation nor proof in regard to any similar Mexican statute.

The main argument was directed toward establishing the proposition that under the circumstances of the case the defendants were guilty of a constructive fraud and were liable by reason of their acquisition of the assets of the Mexican company to pay the debts of that company, including the alleged debt due from it to Mr. Barnar. In order to establish and enforce any equi-

table liability of the defendants, or either of them, to the complainant to pay the amount of this alleged debt, the first subject-matter for investigation naturally must be whether any such debt exists. This is an inquiry in regard to a strictly legal liability, but it is a necessary inquiry in this suit in equity in which purely equitable liabilities of the defendants to pay this debt are set up. Having found that the alleged debt had no existence, the elaborate arguments of counsel offered to show that, assuming that such a legal indebtedness is in existence, the defendants are liable in equity to pay it, may, I think, remain unconsidered.

I shall advise an order dismissing the bill.